United States Courts
Southern District of Texas
FILED

September 13, 2024

Nathan Ochsner, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>██████████████████ )<br>)<br>EMMANUEL OKEREKE, )<br>   aka Omo Igbo )<br>OLALEKAN BASHIRU, )<br>   aka Ola Bash )<br>██████████████████ )<br>CASEY ADESULU JR., )<br>██████████████████ )<br>██████████████████ )<br>██████████████████ )<br>██████████████████ )<br>OLABODE BANKOLE, )<br>INDIA BARNES, )<br>ARUAN DRAKE, )<br>EMMANUEL ESSILFIE )<br>██████████████████ )<br>JEREMIAH GLINSEY, )<br>LON GOODMAN, )<br>██████████████████ )<br>██████████████████ )<br>██████████████████ )<br>KINGSLEY OWUSU, )<br>ANTON PARKER, )<br>CARLTON PRUITT, )<br>██████████████████ )<br>██████████████████ )<br>)<br>Defendants. )<br>) | **THIRD SUPERSEDING INDICTMENT**<br><br>**4:24-mj-412**<br><br>JUDGE JAMES R. KNEPP, II<br><br>CASE NO. <u>3:23 CR 122</u><br>   Title 18, United States Code,<br>   Sections 1349, 1956(h), and 2 |

COPY

COUNT 1
(Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349)

The Grand Jury charges:

1. From in or around January 2020 until in or around September 2023, in the Northern District of Ohio, Western Division, and elsewhere, Defendants ▇▇▇ EMMANUEL OKEREKE, OLALEKAN BASHIRU, CASEY ADESULU JR., ▇▇▇ OLABODE BANKOLE, INDIA BARNES, ARUAN DRAKE, EMMANUEL ESSILFIE, ▇▇▇ JEREMIAH GLINSEY, LON GOODMAN, ▇▇▇ KINGSLEY OWUSU, ANTON PARKER, CARLTON PRUITT, ▇▇▇ together with others known and unknown to the Grand Jury, knowingly combined, conspired, confederated, and agreed with each other, and with others known and unknown to the Grand Jury, to commit an offense under Title 18, United States Code, Chapter 63, to wit: knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud and attempting to do so, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, and pictures, in violation of Title 18, United States Code, Section 1343.

2. The scheme generally worked as follows. Unknown co-conspirators, likely overseas, maintained a computer hacking campaign targeting individuals, businesses, and other organizations in the United States and elsewhere. The campaign's object was to gain access to



genuine e-mail accounts held by individual users. The co-conspirators then monitored the communications and other activities of the individual users in order to learn each user's business practices and contacts.

3. After gaining sufficient intelligence about the nature of a hacking victim's activities, the co-conspirators sent a fraudulent e-mail to either the hacking victim, or to someone communicating with the hacking victim, requesting payment. Because the co-conspirators were familiar with the hacking victim's activities, the fraudulent e-mail was crafted in a way to convince the recipient that the request for payment was genuine.

4. The fraudulent e-mails generally took three forms, each of which included false and fraudulent pretenses, representations, and promises:

    a. *Spoof e-mails.* Having hacked a victim's e-mail account, the co-conspirators learned, for example, that the victim owed money to a creditor with whom the victim was in regular contact. After learning the nature of the debt, the co-conspirators created an e-mail account with an address closely resembling the creditor's address. The co-conspirators then sent a "spoof" e-mail from this new account to the hacking victim with payment instructions. Believing the "spoof" e-mail to be genuine, the victim sent the money as directed, not knowing that the funds were being deposited into a bank account controlled by someone conspiring with the sender of the "spoof" e-mail.

    b. *E-mails to third parties from hacked accounts.* After hacking a victim's e-mail account, the co-conspirators learned that the victim was demanding payment from a debtor with whom the victim was in regular contact. Because the co-conspirators already controlled the genuine e-mail account, there was no need to

3

create a new "spoof" e-mail account. Instead, the co-conspirators used their control of the hacked e-mail account to send an e-mail to the debtor demanding payment into a bank account controlled by another co-conspirator. The debtor complied, not knowing the funds were being sent to a bank account controlled by one of the conspirators and not to the individual actually owed the debt. Defendants similarly used this method to request account withdrawals, for example, by sending an e-mail to a victim's investment broker directing a withdrawal to be deposited into a co-conspirator's account.

c. *Internal e-mails from hacked accounts.* The computer-hacking co-conspirators hacked e-mail accounts belonging to corporate officers, such as a victim corporation's CEO. The conspirators then sent an e-mail from the CEO to the corporation's financial officer instructing him to make payment for a given purpose. The financial officer then complied and sent the funds to a bank account controlled by another conspirator.

5. Defendants charged herein were responsible for maintaining an ample supply of domestic bank accounts into which their computer-hacking co-conspirators could direct victim payments. Defendants did this using one, all, or a combination of the following methods:

a. *Synthetic Identities.* Defendants created numerous synthetic identities, which they used to open bank accounts. These identities were synthetic in that they did not belong to real people, but instead relied on a fabricated name, social security number, residential history, and similar information.

b. *Shell Companies.* Defendants used both these synthetic identities and their own identities to pose as business owners seeking to open accounts in the

names of shell companies that they created solely for the fraudulent purpose of legitimizing and concealing the receipt and disbursement of fraud proceeds.

    c. *Personal Accounts*. On occasion, Defendants used accounts in their own names to receive and disburse fraud proceeds.

6. Defendants furthered the scheme to defraud by transmitting or causing to be transmitted e-mail communications and transferring or causing to be transferred funds, with both types of transmissions being sent by means of wire communication in interstate and foreign commerce. These wire communications were sent from, to, and through the Northern District of Ohio from places outside the state of Ohio.

7. Defendants also furthered the scheme to defraud by concealing it. They did so by quickly disbursing the funds from the accounts into which they were initially deposited, thus frustrating attempts to recover the funds if the fraud were discovered.

8. In all, the scheme defrauded at least 600 victims. Although some funds were frozen or recovered, the scheme nonetheless convinced victims to part with at least $120 million. Those victims resided throughout the United States, including in Ohio, New York, California, Texas, Kansas, North Carolina, Florida, Arizona, Michigan, Connecticut, Wisconsin, Minnesota, Tennessee, Virginia, Maryland, South Carolina, and New Jersey. Victims also resided in Canada, Mexico, Bermuda, and Romania.

9. It was part of the scheme that:



    b. OKEREKE, BASHIRU, ▮▮▮▮▮ directed the conspiracy's activities for ▮▮▮▮▮ in Chicago.

c. BANKOLE directed the conspiracy's activities in Atlanta and provided co-conspirator's with false identifications.

d. GOODMAN owned and operated New Dolton Currency Exchange. GOODMAN knowingly allowed Defendants to cash fraudulent checks at the New Dolton Currency Exchange, and he retained a portion of the proceeds for himself. GOODMAN also sent e-mails to financial institutions in an effort to conceal the scheme.



f. ADESULU, ███ BASHIRU, ███ DRAKE, ███ GLINSEY, ███ OKEREKE, PARKER, and ███ obtained or negotiated checks funded by fraud proceeds.

g. ███ ADESULU, ███ ███ BARNES, ███ ESSILFIE, ███ GLINSEY, ███ OWUSU, PARKER, PRUITT, ███ opened bank and related accounts using real or synthetic identities for the purpose of receiving and transferring fraud proceeds obtained from victims.

## Acts in Furtherance of the Conspiracy

10.    In furtherance of the above scheme, and to effect the objects and conceal the existence thereof, Defendants and others performed acts in the Northern District of Ohio and elsewhere, including, but not limited to, the following:



h. On or about March 10, 2022, a co-conspirator caused Business Victim 4 of Chagrin Falls, Ohio, to send an interstate wire transfer of $75,631 to a bank account controlled by another co-conspirator.

j. On or about April 15, 2022, a co-conspirator caused Business Victim 6 of Hudson, Ohio, to send an interstate wire transfer of $20,000 to a bank account controlled by a different co-conspirator.

k. On or about April 28, 2022, a co-conspirator caused Municipal Victim 1 in Norwalk, Ohio, to send an interstate wire transfer of $165,693 to a bank account controlled by GLINSEY.



    s.  On or about August 12, 2022, a co-conspirator caused Business Victim 11 of Hudson, Ohio, to send an interstate wire transfer of $331,814 to a bank account controlled by another co-conspirator.



x. On or about November 21, 2022, a co-conspirator registered "DMG Food Co." as a corporation with the Ohio Secretary of State's Office.

y. On or about December 1, 2022, a co-conspirator opened a PNC Bank account in Independence, Ohio in the name of DMG Food Co.

z. On or about December 6, 2022, a co-conspirator caused Business Victim 14 to send an interstate wire transfer of $150,000 to the DMG Food Co. PNC Bank account opened in Independence, Ohio.

cc. On or about February 16, 2023, a co-conspirator caused Municipal Victim 3 to send a $323,545.27 wire transfer to an account controlled by ADESULU.

dd. On or about April 3, 2023, a co-conspirator caused Business Victim 16 of Westfield Center, Ohio, to send via overnight courier a check for $212,500 that was later deposited into a bank account controlled by

11



All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
(Money Laundering Conspiracy, 18 U.S.C. § 1956(h))

The Grand Jury further charges:

11. The factual allegations of paragraphs 2 through 10 of this third superseding indictment are incorporated herein by reference.

12. From in or around January 2020 until in or around September 2023, in the Northern District of Ohio, Western Division and elsewhere, Defendants ▬▬▬ ▬▬▬ EMMANUEL OKEREKE, OLALEKAN BASHIRU, ▬▬▬ CASEY ADESULU JR., ▬▬▬
▬▬▬

███████████, INDIA BARNES, ARUAN DRAKE, EMMANUEL ESSILFIE, ███████████ JEREMIAH GLINSEY, LON GOODMAN, ███████████

███████████████████████████████████████

KINGSLEY OWUSU, ANTON PARKER, CARLTON PRUITT ███████

███████████ together with others known and unknown to the Grand Jury, knowingly and intentionally combined, conspired, and agreed with each other to commit offenses against the United States, in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

    a. knowingly conducting and attempting to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and that while conducting and attempting to conduct such financial transaction, knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, all in violation of Title 18, United State Code, Section 1956(a)(1)(B)(i), and

    b. knowingly engaging and attempting to engage in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, withdrawals, deposits, purchases, and wire transfers of funds, such property having been derived from a specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, all in violation of Title

18, United States Code, Section 1957.

13. Having gained control of the stolen funds as described in paragraphs 2 through 10 of this third superseding indictment, the Defendants next laundered those funds through the domestic banking system and often converted the funds to U.S. currency. They did so almost exclusively through the following steps:

a. *Cashier's Checks.* When a given Defendant received funds into an account he or she controlled, that Defendant then purchased one or more cashier's checks, funded by the fraud proceeds, and then had each check made payable to a shell company owned by a co-conspirator and created for the purpose of laundering funds. On occasion, Defendants purchased cashier's checks, funded by fraud proceeds, and then had the checks made payable to a co-conspirator in that co-conspirator's actual name.

b. *Cashing the Cashier's Checks.* Defendants then cashed the cashier's checks in exchange for U.S. currency. Most checks were cashed at the same check-cashing location, New Dolton Currency Exchange in Dolton, Illinois. Defendants often used false identification documents as part of this process in order to make the check casher's records appear as though an authorized person presented the check for payment.

14. Defendants executed these transactions in order to conceal the nature, source, and disposition of funds stolen from the e-mail compromise victims. The ultimate disposition of the proceeds in U.S. currency resulted in the stolen funds becoming nearly untraceable and thus unrecoverable. All of the transactions, moreover, involved more than $10,000 in funds derived from the computer hacking scheme.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 3–4
(Money Laundering, 18 U.S.C. § 1956(a)(1)(B)(i))

The Grand Jury further charges:

15. The factual allegations of paragraphs 2 through 10, 13, and 14 of this third superseding indictment are incorporated herein by reference.

16. On the dates listed in the table below, in the Northern District of Ohio and elsewhere, ███████████████████████ knowingly conducted and attempted to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, each such transaction constituting a separate count:

| Count | Approx. Date | |
|---|---|---|
| 3 | September 13, 2022 | ███████ |
| 4 | December 9, 2022 | ███████ |

All in violation of Title 18, United State Code, Sections 1956(a)(1)(B)(i) and 2.

## FORFEITURE SPECIFICATION

The Grand Jury further charges:

17. The allegations of Counts 1 through 4, inclusive, are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 18, United States Code, Section 982(a)(1), and Title 28, United States Code, Section 2461(c). As a result of the foregoing offenses, Defendants ▓▓▓ EMMANUEL OKEREKE, OLALEKAN BASHIRU, ▓▓▓ CASEY ADESULU, JR., ▓▓▓ OLABODE BANKOLE, INDIA BARNES, ARUAN DRAKE, EMMANUEL ESSILFIE, ▓▓▓ JEREMIAH GLINSEY, LON GOODMAN, ▓▓▓ KINGSLEY OWUSU, ANTON PARKER, CARLTON PRUITT, ▓▓▓ shall forfeit to the United States: all property, real and personal, which constitutes—or is derived from—proceeds traceable to the violations charged in Count 1; and, all property, real and personal, involved in the violations charged in Counts 2 through 4, inclusive, and all property traceable to such property; including, but not limited to, the following:

  a.) $763.15 seized pursuant to the execution of a federal seizure warrant on August 29, 2022, from JP Morgan Chase Bank account number: *****2191. The account is in the name of NITA-ING SALES and is associated with OLALEKAN M. BASHIRU.

  b.) $529,129.85 seized pursuant to the execution of a federal seizure warrant on August 29, 2022, from JP Morgan Chase Bank Cashier's Check account number: *****1359.

16

This $529,129.85 was initially deposited into JP Morgan Chase Bank account number: *****2191 and, thereafter, was used to purchase the following cashier's checks:

- i.) JP Morgan Chase Bank Cashier's Check # ******2568, in the amount of $169,670.35, dated August 15, 2022, payable to Primetime Movers Reliance LLC and associated with OLALEKAN M. BASHIRU.

- ii.) JP Morgan Chase Bank Cashier's Check # ******2569, in the amount of $189,459.50, dated August 15, 2022, payable to Multichoice Concept LLC and associated with OLALEKAN M. BASHIRU.

- iii.) JP Morgan Chase Bank Cashier's Check # ******2588, in the amount of $85,000.00, dated August 15, 2022, payable to Sparkle Transport Service Inc and associated with OLALEKAN M. BASHIRU.

- iv.) JP Morgan Chase Bank Cashier's Check # ******2589, in the amount of $85,000.00, dated August 15, 2022, payable to Primetime Movers Reliance LLC and associated with OLALEKAN M. BASHIRU.

c.) $90,000.00 seized pursuant to the execution of a federal seizure warrant on or about August 29, 2023, from JP Morgan Chase Bank Cashier's Check account number: xxxxx1375. The seized $90,000.00 is funds used to purchase JP Morgan Chase Bank Cashier's Check #xxxxxx8314 in the amount of $90,000.00, dated April 5, 2022, and made payable to Lakeside Cleaning Services, LLC. OLALEKAN BASHIRU is associated with Lakeside Cleaning Services, LLC.

d.) $90,000.00 seized pursuant to the execution of a federal seizure warrant on or about August 29, 2023, from JP Morgan Chase Bank Cashier's Check account number: xxxxx1359. The seized $90,000.00 is funds used to purchase JP Morgan Chase Bank Cashier's Check #xxxxxx9024 in the amount of $90,000.00, dated August 3, 2022, and made payable to Sparkle Transport Services, Inc. OLALEKAN BASHIRU is associated with Sparkle Transport Services, Inc.





A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.